KENNETH M. SORENSON
United States Attorney
District of Hawaii

MOHAMMAD KHATIB
MARGARET C. NAMMAR #9045
Assistant United States Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
E-mail: Mohammad.Khatib@usdoj.gov
         Margaret.Nammar@usdoj.gov

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
United States Department of Justice

WILLIAM GULLOTTA
Trial Attorney, Public Integrity Section
Criminal Division
U.S. Department of Justice
1301 New York Ave., N.W., 10th Fl.
Washington, D.C. 20530
Telephone: (202) 514-1412
E-mail: William.Gullotta2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. CR 22-00058-JAO-KJM-03 |
| | ) | |
| Plaintiff, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM; CERTIFICATE OF |
| vs. | ) | SERVICE |
| | ) | |
| RAJESH P. BUDHABHATTI, (03) | ) | Date: February 6, 2026 |
| | ) | Time: 9:30 a.m. |
| Defendant. | ) | Judge: Hon. Jill A. Otake |
| | ) | |
| | ) | |
| | ) | |

UNITED STATES' SENTENCING MEMORANDUM

**TABLE OF CONTENTS**

**Page**

BACKGROUND ...........................................................................................................2

   I.   Procedural History ...........................................................................................2

   II.   The Offense Conduct........................................................................................2

      A.   The Bribery and Kickback Conspiracy and Scheme ...................................3

      B.   Defendant Budhabhatti's Central Role ........................................................5

THE SENTENCING GUIDELINES CALCULATION .........................................6

   I.   The Advisory Guidelines Range.......................................................................7

      A.   The PSR Correctly Applied the Multiple Bribes Enhancement ..................8

      B.   The PSR Correctly Calculated the Loss Amount .......................................13

      C.   The PSR Correctly Denied an Adjustment for Acceptance of
      Responsibility ...........................................................................................16

THE RELEVANT SECTION 3553(A) FACTORS ..............................................19

   I.   The Nature and Circumstances of the Offense and the Seriousness of the
   Offense .............................................................................................................20

   II.   The Defendant's History and Characteristics...................................................23

   III.   The Need for Deterrence...................................................................................27

   IV.   The Need to Avoid Unwarranted Sentence Disparities .............................29

CONCLUSION........................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Gall v. United States*,
552 U.S. 38 (2007) ................................................................................ 7

*Kimbrough v. United States*,
552 U.S. 85 (2007) .............................................................................. 19

*Nelson v. United States*,
555 U.S. 350 (2009) .............................................................................. 7

*United States v. Arshad*,
239 F.3d 276 (2d Cir. 2001) ...................................................... 9, 11, 12

*United States v. Arturo Cuellar, et al.*,
No. 19-CR-00522 (S.D. Tex Jan. 18, 2023) ...................................... 30

*United States v. Booker*,
543 U.S. 220 (2005) .............................................................................. 7

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) ................................................................ 7

*United States v. Conyers*,
737 F. Supp. 2d 696 (E.D. Mich. 2010) ............................................ 22

*United States v. Ford*,
344 F. App'x 167 (6th Cir. 2009) ........................................................ 9

*United States v. Gambino-Ruiz*,
91 F.4th 981 (9th Cir. 2024) ........................................................ 16, 17

*United States v. Hamilton*,
3:11-cr-00013-HEH (E.D. Va. Aug. 12, 2011) .................................. 30

*United States v. Hayes*,
762 F.3d 1300 (11th Cir. 2014) .......................................................... 22

*United States v. Hilgers*,
560 F.3d 944 (9th Cir. 2009) .............................................................. 25

*United States v. Hoffman*,
901 F.3d 523 (5th Cir. 2018) .............................................................. 26

**Cases**                                                                    **Page(s)**

*United States v. Inouye, et al.*,
  No. 21-CR-00034-LEK (D. Haw. May 24, 2023) ............................................ 31

*United States v. Kahlon*,
  38 F.3d 467 (9th Cir. 1994) ................................................................ 9

*United States v. Kinter*,
  235 F.3d 192 (4th Cir. 2000) ......................................................... 9, 15

*United States v. Kuhlman*,
  711 F.3d 1321 (11th Cir. 2013) ......................................................... 26

*United States v. Maggio*,
  No. 15-CR-00001-BSM (E.D. Ark. Mar. 24, 2016) ........................................ 30

*United States v. Martin*,
  455 F.3d 1227 (11th Cir. 2006) ......................................................... 27

*United States v. Menendez*,
  No. 23-CR-00490-SHS (S.D.N.Y. Jan. 29, 2025) .......................................... 29

*United States v. Misla-Aldarondo*,
  478 F.3d 52 (1st Cir. 2007) ............................................................. 9

*United States v. Montgomery*,
  275 F. App'x 647 (9th Cir. 2008) .................................................... 29-30

*United States v. Morales*,
  11 F.3d 915 (9th Cir. 1993) ............................................................ 12

*United States v. Morgan*,
  635 F. App'x 423 (10th Cir. 2015) .............................................. 23, 26, 27

*United States v. Mueffelman*,
  470 F.3d 33 (1st Cir. 2006) ............................................................ 26

*United States v. Peperno*,
  119 F.4th 322 (3d Cir. 2024) ................................................. 9, 13, 14, 15

*United States v. Peppel*,
  707 F.3d 627 (6th Cir. 2013) ........................................................... 26

| Cases | Page(s) |
|---|---|

*United States v. Reagan,*
  725 F.3d 471 (5th Cir. 2013) ............................................................... 14

*United States v. Renzi,*
  769 F.3d 731 (9th Cir. 2014) ......................................................... 14, 15

*United States v. Ring,*
  811 F. Supp. 2d 359 (D.D.C. 2011) ..................................................... 13

*United States v. Solomon,*
  892 F.3d 273 (7th Cir. 2018) ............................................................... 13

*United States v. Sorenson,*
  233 F. Supp. 3d 690 (S.D. Iowa 2017) ................................................ 22

*United States v. Stant,*
  No. 22-CR-00072-DKW (D. Haw. Feb. 8, 2023) ........................... 30-31

*United States v. Woods,*
  No. 17-CR-50010-TLB (W.D. Ark. Sept. 6, 2018) ............................. 30

*United States v. Soumano,*
  318 F.3d 135 (2d Cir. 2003) ......................................................... 10, 11

*United States v. Spano,*
  411 F. Supp. 2d 923 (N.D. Ill. 2006) ............................................. 27, 28

*United States v. Weaver,*
  175 F. App'x 506 (3d Cir. 2006) ........................................................... 9

**Statutes and Rules**

18 U.S.C. § 1343 ............................................................................... 2, 8

18 U.S.C. § 1346 ............................................................................... 2, 8

18 U.S.C. § 1349 ............................................................................... 2, 8

18 U.S.C. § 1956 .................................................................................... 2

18 U.S.C. § 3553 ........................................................................... *passim*

28 U.S.C. § 994 ................................................................................... 25

U.S.S.G. § 1B1.3 ........................................................................... 8, 15

U.S.S.G. § 2B1.1 ............................................................... 6, 8, 14, 15

iv

**Statutes and Rules**

U.S.S.G. § 2C1.1 ........................................................................................ *passim*

U.S.S.G. § 3E1.1 ............................................................................... 6, 16, 19

U.S.S.G. § 3D1.2 ....................................................................................... 11

U.S.S.G. § 5H1.2 ....................................................................................... 24

U.S.S.G. § 5H1.5 ....................................................................................... 24

U.S.S.G. § 5H1.6 ....................................................................................... 24

U.S.S.G. § 5H1.10 ..................................................................................... 24

For seven years, Rajesh P. Budhabhatti (hereinafter, "the defendant" or "Budhabhatti") corrupted Hawaii County government and undermined its affordable housing policy.  Together with his coconspirators, the defendant made and concealed bribery and kickback payments to Alan Rudo, a Hawaii County housing official, to obtain lucrative affordable housing agreements ("AHAs") worth over $11 million for his and his coconspirators' companies.  The conspirators pretended that they would build desperately needed affordable housing for struggling Hawaiians.  Instead of building the community up, the conspirators broke down the AHAs, lining their own pockets with the affordable housing credits and land that the AHAs bestowed and offloading or eliminating the obligation to construct affordable housing.  When the County began to demand performance, the defendant and his cohorts doubled down on their lies and engaged in a pressure campaign to continue to reap zero-cost profits with no effort to build housing for low-income residents.  After a three-week trial beginning in May 2025, the jury convicted the defendant of one count of bribery conspiracy and nine counts of honest services wire fraud.  The defendant has not expressed any remorse or accepted responsibility.

For the reasons set forth below, and considering the relevant sentencing factors in 18 U.S.C. § 3553(a), the defendant's criminal conduct justifies a custodial sentence of 151 months followed by three years of supervised release.  In

1

addition, the government requests that the Court order the defendant to pay a forfeiture money judgment in the amount of $549,775.

## BACKGROUND

### I.    Procedural History

On May 30, 2024, a federal grand jury sitting in the District of Hawaii returned a second superseding indictment ("SSI") charging the defendants Paul Joseph Sulla, Jr., Gary Charles Zamber, and Rajesh P. Budhabhatti with one count of Conspiracy to Commit Honest Services Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1), and nine counts of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts 2-10), in connection with a years-long bribery and kickback scheme. ECF No. 142; ECF No. 647, PSR ¶ 1. Additionally, defendant Sulla was charged with Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count 11), for conducting a financial transaction designed to conceal proceeds of the scheme. *Id.* All three defendants proceeded to trial on May 13, 2025. ECF No. 428. After a three-week jury trial, the defendants were convicted on all counts. ECF No. 514.

### II.    The Offense Conduct

Having presided over the trial and extensive pre- and post-trial litigation, the Court has a comprehensive understanding of the bribery and kickback scheme. A short recap follows.

2

A.    **The Bribery and Kickback Conspiracy and Scheme**

Over a seven-year period, the defendants conspired and schemed to pay bribes and kickbacks worth almost $2 million to Alan Scott Rudo, a Housing Specialist for the Hawaii County Office of Housing and Community Development ("OHCD").  PSR ¶ 13.  Although the defendants knew that Rudo owed a fiduciary duty to the people of the County, the defendants offered and paid him bribes and kickbacks to use his official position to ensure the County approved four AHAs awarded to their so-called development companies.  PSR ¶ 17.  Collectively, the four AHAs created value in the form of affordable housing credits ("AHCs") and land worth over $11 million.  However, the defendants' companies—ERH1, Luna Loa Developments, West View Developments, and Plumeria at Waikoloa—were shams.  *See* PSR ¶ 16.  Despite making millions of dollars from the AHAs, the companies did not build a single unit of affordable housing.  At trial, the United States introduced evidence of the bribery and kickback scheme, which had multiple components.

In the case of ERH1, Luna Loa, and West View, Rudo advised the County to award those companies AHCs without first building any affordable housing.  PSR ¶ 17.  Instead of constructing and selling or renting affordable housing, as they agreed to do, the companies sold the AHCs reaping a windfall.  *Id.*  Rudo also performed other official acts to benefit the companies and facilitate the scheme:

3

(i) he ensured that the County approved the transfers of the AHCs; (ii) he obtained waivers making the AHCs more transferrable and valuable; and (iii) he obtained a partial release relieving West View of part of its affordable housing obligation and making that portion of West View's land more valuable. *See*, *e.g.*, Trial Ex. 287, *infra*. In the case of Plumeria, Rudo advised the County to approve an AHA awarding the company over 11 acres of donated land based on the assertion that Plumeria was a non-profit that would assume a preexisting requirement to build affordable housing on the parcel. PSR ¶ 47. Instead of building affordable housing, Plumeria sold the land for approximately $1.5 million. PSR ¶ 51. In each case, the defendants offloaded all their affordable housing obligations under the AHAs to other developers. They never put a single shovel into the ground. After selling the AHAs and land they acquired through Rudo's official acts, the defendants paid Rudo a series of kickbacks—a cut of the profits they received.

The defendants knew that what they were doing was illegal, so they used sophisticated means to hide the kickback payments to Rudo. They used shell companies, like Kaha Kii and Dezign Artz, to funnel kickbacks to Rudo. They also created a complex organizational structure using convoluted trust agreements in the form of Ad Astra Ventures Trust and Active REI Trust to disguise Rudo's interest in Plumeria. PSR ¶ 49.

B.    **Defendant Budhabhatti's Central Role**

Budhabhatti played a central role in the conspiracy and scheme.  As Rudo

explained at trial, Budhabhatti owned the original 18 acres that they used to obtain

the first AHA and AHCs.  05/15/2025 Tr. at 168-69.  They called this project Eden

Roc Housing 1 or ERH1.  *Id.* at 170.  Since Budhabhatti owned that parcel, he and

Rudo agreed, initially, that Rudo would get 25 percent of the sale of the AHCs, in

the form of land or money.  *Id.*  In subsequent executions of the scheme, where

Budhabhatti did not own the parcel, he and Rudo agreed that they would split the

proceeds evenly after Budhabhatti paid Zamber a five percent cut.  *Id.*  Budhabhatti

was the face of the developer and brought Zamber in as the attorney who provided

a gloss of legitimacy to the group.  As the "developer," Budhabhatti signed off on

all the AHAs and/or authorized Zamber to sign off on his behalf.  Budhabhatti was

listed on the operating agreements as the 100 percent owner of Luna Loa and West

View.  *See* Trial Exs. 10, 12.  His own statements corroborate the corporate

records.  *See* Trial Ex. 191 (January 15, 2019, email from Budhabhatti to Sulla, and

copying Rudo and Zamber, stating, "I am the sole owner of Westview, LunaLoa

[sic] and Greenpower").  He also controlled the bank accounts and paid Rudo

directly his share of the profits—kickback payments for Rudo's official acts.  And

he enriched and attempted to enrich himself to the tune of over $1 million,

5

spending much of the money on foreign travel, living expenses, and other luxuries, but none of it on affordable housing.

## THE SENTENCING GUIDELINES CALCULATION

The United States Probation Office ("USPO") issued a draft PSR on November 20, 2025.  ECF No. 597.  On January 6, 2026, the defendant filed a sentencing statement.[1]  ECF No. 615.  In relation to the Guidelines calculations, he objected to the application of the 2-level multiple bribes enhancement under United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") § 2C1.1(b)(1) and to the 18-level enhancement corresponding to the "loss amount" under U.S.S.G. § 2C1.1(b)(2).[2]  The defendant also objected to the denial of a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  The United States responded to those objections in a supplemental sentencing statement filed on January 15, 2026.  ECF No. 627.  The final PSR, which contains the parties' objections and the USPO's responses thereto, was filed on January 27, 2026.  ECF No. 647.  In it, the USPO maintains that the enhancement for multiple bribes applies, and that the defendant has not demonstrated accepted responsibility.  The

---

[1]    The United States also filed a sentencing statement.  *See* ECF No. 617.

[2]    Although a misnomer, the United States is using the phrase "loss amount" as shorthand for the enhancement under U.S.S.G. § 2C1.1(b)(2) for readability and because the level of the enhancement is determined according to a cross-reference to the loss table set forth in U.S.S.G. § 2B1.1(b)(1).

6

USPO further agrees with the United States' position that a 20-level enhancement for loss amount applies.  The USPO has correctly calculated the Guidelines.

## I.    The Advisory Guidelines Range

It is well-established that a court should consider a variety of factors in imposing a sentence on a criminal defendant, including the applicable range established by the Guidelines.  18 U.S.C. § 3553.  Although the Guidelines and policy statements are advisory in nature, courts "must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  A sentencing court thus begins by calculating the applicable Guidelines range, which serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (the Guidelines are the starting point for a district court in determining a reasonable sentence).  The court then must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant. *See Nelson v. United States*, 555 U.S. 350, 351 (2009) (explaining that after the court determines the applicable Guidelines sentencing range, it must "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors").

The United States Probation Office has calculated the defendant's

Sentencing Guidelines as follows:

| SENTENCING GUIDELINES CALCULATIONS 18 U.S.C. §§ 1343, 1346, 1349 (Counts 1-10) | |
|---|---|
| Base Offense Level (U.S.S.G. § 2C1.1(a)(2)) | 12 |
| Offense Involved More Than One Bribe (U.S.S.G. § 2C1.1(b)(1)) | +2 |
| Value of Anything Obtained Between $9.5M and $25M (U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(K)) | +20 |
| *Adjusted Offense Level* | *34* |
| | |
| **TOTAL OFFENSE LEVEL** | **34** |
| **Criminal History Category I** | |
| **151-188 Months of Imprisonment** | |

## A.      The PSR Correctly Applied the Multiple Bribes Enhancement

The final PSR correctly applied U.S.S.G. § 2C1.1(b)(1) in calculating the

defendant's total offense level because the conspiracy and scheme involved more

than one bribe.  The relevant specific offense characteristic reads: "[i]f the offense

involved more than one bribe [], increase by 2 levels."  U.S.S.G. § 2C1.1(b)(1).

Application Note 2 of this Guideline, however, provides that "[r]elated payments

that, in essence, constitute a single incident of bribery or extortion (*e.g.*, a number

of installment payments for a single action) are to be treated as a single bribe or

extortion, even if charged in separate counts."  U.S.S.G. § 2C1.1(b)(1), cmt. n.2.

The Court may consider relevant conduct under U.S.S.G. § 1B1.3, such as a co-

conspirator's reasonably foreseeable actions in furtherance of a conspiracy, in

determining whether this specific offense characteristic applies.  *See*, *e.g.*, *United States v. Peperno*, 119 F.4th 322, 332 (3d Cir. 2024); *United States v. Misla-Aldarondo*, 478 F.3d 52, 71 (1st Cir. 2007); *United States v. Kinter*, 235 F.3d 192 (4th Cir. 2000); *United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994). Although the Ninth Circuit has not yet provided significant guidance on the scope of U.S.S.G. § 2C1.1(b)(1), other circuits have done so.

In *United States v. Arshad*, 239 F.3d 276, 280 (2d Cir. 2001), the Second Circuit formulated a set of factors for courts to apply when considering U.S.S.G. § 2C1.1(b)(1); the *Arshad* court's formulation has since been followed in multiple other circuits.  *See United States v. Ford*, 344 F. App'x 167, 170 (6th Cir. 2009); *United States v. Weaver*, 175 F. App'x 506, 510 (3d Cir. 2006).  The *Arshad* factors include (1) whether the payments were to influence "a single action," 239 F.3d at 280; (2) whether "the pattern and amount of payments bear the hallmarks of installment payments" within the meaning of Application Note 2 because they constitute partial payments of "a fixed final sum," *id.* at 281; and (3) whether "the method for making each payment remains the same," *id.* at 282.

Each of these factors favors a finding that the conspiracy and scheme here involved multiple bribe payments within the meaning of U.S.S.G. § 2C1.1(b)(1). First, Rudo's kickback payments were paid by each of the three defendants and were made to influence numerous distinct official actions.  For example, Rudo

9

secured four different AHAs for the defendants, each involving at least one

separate official act, in exchange for his kickbacks.  Trial Exhibit 287, included

below, summarizes various official acts in exchange for kickback payments that

Rudo received over the course of the conspiracy and scheme:



In short, the defendants paid Rudo not merely for a single official act, but for

numerous official acts in different amounts.  In *United States v. Soumano*, 318 F.3d

135 (2d Cir. 2003), the court addressed similar circumstances.  There, Soumano

offered to pay an undercover agent (posing as a Social Security Administration

employee) in exchange for false social security cards; the parties agreed that the

payment would be $250 per false social security card.  *Id.* at 136-37.  In one

meeting, Soumano paid $2,500 in cash for eleven false documents. *Id.* In the second meeting, Soumano paid $500 in cash for two false documents. *Id.* On these facts, the Second Circuit upheld the district court's application of U.S.S.G. § 2C1.1(b)(1) over Soumano's objection that he made payments to the same individual for the same type of benefit and on essentially a fixed payment schedule ($250 per card), emphasizing that "multiple payments meant to influence more than one action should not be merged together for purposes of § 2C1.1 merely because they share a single overall goal or are part of a larger conspiracy." *Id.* at 137 (citation modified). The circumstances in this case are similar because, just as the $250-per-card agreement conceptually joined the two distinct exchanges in *Soumano*, a single overarching conspiracy and scheme unites Rudo's distinct exchanges of a percentage of the profits from different AHAs. Indeed, the case for applying U.S.S.G. § 2C1.1(b)(1) is even stronger here than in *Soumano*, because the defendants' payments were made in exchange for 14 distinct actions connected to four separate AHAs.[3]

---

[3]    Notably, the Sentencing Commission added U.S.S.G. § 2C1.1(b)(1) because "repeated instances of bribery . . . involv[ing] the same course of conduct or common scheme or plan and the same victim" were not being reflected in a defendant's final offense level (because multiple counts of bribery in such circumstances would be grouped together pursuant to § 3D1.2). *See* U.S.S.G. app. C, amend. 121, at 48; *see also Arshad*, 239 F.3d at 281 n.2.

Second, the pattern and amount of payments here do not "bear the hallmarks of installment payments." *Arshad*, 239 F.3d at 281. The defendants' kickbacks do not constitute partial payments of any "fixed final sum." *Id.* Instead, the agreement here was for a share of the profits, whatever the profits might be. And the agreement was open-ended and indefinite; there is no indication that the conspiracy and scheme would have ceased absent Rudo's sudden departure from the OHCD as the authorities and the press began to scrutinize the AHAs. The defendant's argument, if accepted, would mean that Rudo could continue receiving kickbacks as a public official for decades under the circumstances of this case without ever legally taking "more than one bribe." Such an interpretation is plainly incorrect.[4]

The evidence showed that Rudo received these payments from each of the defendants and through different means (including money and land). For example, the defendant and Zamber made direct payments to Rudo in the form of checks, while Sulla made both direct payments to Rudo in the form of checks and indirect payments in the form of land. *See United States v. Morales*, 11 F.3d 915, 917 (9th Cir. 1993) (upholding U.S.S.G. § 2C1.1(b)(1) enhancement where "bribes came

---

[4]    To be sure, the Sentencing Commission could have written this Guidelines provision to add two levels when there are multiple *schemes*, as Budhabhatti suggests, as opposed to multiple bribes. Clearly, that was not the Commission's intention. Instead, the Commission has recognized that it is more serious conduct to repeatedly bribe a public official than it is to do so only once.

from various sources" and were implemented by various means).  In short, the

multi-year conspiracy and scheme here, which involved multiple separate

payments made through various means from various payors, and in exchange for

numerous and varied official acts, involved "more than one bribe" for purposes of

U.S.S.G. § 2C1.1(b)(1).

Finally, Budhabhatti lacks support for his argument that the enhancement for

multiple bribes is inapplicable whenever the government presents a stream of

benefits theory at trial.  His reliance on *United States v. Solomon*, 892 F.3d 273

(7th Cir. 2018) is entirely misplaced because the application of the enhancement

under § 2C1.1(b)(1) was not even an issue in that case.  *See id.*  At least one court,

however, has directly rejected Budhabhatti's argument.  *See United States v. Ring*,

811 F. Supp. 2d 359, 374 (D.D.C. 2011) (rejecting the same argument Budhabhatti

makes here, in part because § 2C1.1(b)(1) speaks not of multiple "schemes to

defraud" but of multiple "bribes" (citation modified)).

### B.    The PSR Correctly Calculated the Loss Amount

The final PSR correctly calculated the loss amount under U.S.S.G.

§ 2C1.1(b)(2).  This specific offense characteristic calls for a "tiered enhancement

based on the value of the payment, the benefit received or to be received in return

for the payment, or the value of anything obtained or to be obtained by a public

official or others acting with a public official, whichever is greatest."  *Peperno*,

13

119 F.4th at 331–32 (citation modified); *accord United States v. Renzi*, 769 F.3d 731, 757 (9th Cir. 2014) (finding the district court must consider the greatest of four methods for calculating value under § 2C1.1(b)(2)).[5]  The loss table in § 2B1.1 determines the level of the enhancement based on the applicable method and value.  *Peperno*, 119 F.4th at 332.

In this case, the correct method for determining the level of the enhancement under § 2C1.1(b)(2) is to apply the value of the contracts, *i.e.*, the four AHAs, that the defendants obtained from the County, which represents the amount of anything obtained or to be obtained by a public official or others acting with a public official.  *See United States v. Reagan*, 725 F.3d 471, 493–94 (5th Cir. 2013) (district court properly applied the value of "anything" that would have been obtained by the public officials and those acting with them as a result of the extortion conspiracy to the defendants' sentence according to the value of the contracts they attempted to extort; the amount was foreseeable to the conspirators and ascertainable).  Here, the value of the AHA contracts totals $11,048,000, and is calculated in paragraph 62 of the final PSR as the "gross benefits" from the affordable housing scheme.  This figure provides the greatest value among the

---

[5]    The fourth method, which looks to the loss to the government from the offense, is inapplicable in this honest services case.  *See* U.S.S.G. § 2C1.1(b)(2).

14

applicable methods for calculating value under § 2C1.1(b)(2).[6]  Under this method

it is irrelevant whether some of the value of those contracts was transferred to

others.  *Renzi*, 769 F.3d at 758 (finding the net value principle stated in application

note 3 applies only to the "benefit received" prong of § 2C1.1(b)(2)).  Therefore, a

20-level enhancement applies.  *See* U.S.S.G. § 2B1.1(b)(1)(k) (value greater than

$9,500,000 and less than $25,000,000).

---

[6]     The United States believes a correct calculation under § 2C1.1(b)(2)'s "net benefits" method results in a similar value but involves a more cumbersome analysis.  The defendant asserts that the guideline should be calculated only according to the value or the benefit that he *personally* received.  His analysis is wrong.  Budhabhatti was convicted of conspiring to commit honest services fraud and participating in a bribery scheme.  The Guidelines instruct that in calculating a defendant's offense level in cases involving jointly undertaken criminal activity—including schemes and conspiracies—relevant conduct shall include all acts and omissions of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]"  U.S.S.G. § 1B1.3(a)(1)(B).  This means that Budhabhatti is accountable for the full amount of the applicable enhancement under § 2C1.1(b)(2).  *See*, *e.g.*, *Peperno*, 119 F.4th at 332 (finding that "a defendant may be held accountable for bribes and things of value provided both to him and to his coconspirators where the bribes to the coconspirators were reasonably foreseeable during the course of the conspiracy."); *United States v. Kinter*, 235 F.3d 192 (4th Cir. 2000) (sentence of defendant who was convicted of bribery for acting as middleman in government contractor kickback scheme was properly enhanced based on the amount of benefit that the contractor received as a result of the bribes rather than the lesser amount of benefit that defendant personally received from the scheme).  Budhabhatti directly participated in the AHAs related to ERH1, Luna Loa, and West View.  Likewise, Plumeria's AHA was reasonably foreseeable to him because Budhabhatti was involved in an earlier related effort by Big Island Affordable Housing (BIAH), a nonprofit that Zamber set up, to obtain a donation of land from Waikoloa Highlands.  5/16/2025 Tr. at 18-35, 5/20/2025 Tr. at 137-39.

### C.   <u>The PSR Correctly Denied an Adjustment for Acceptance of Responsibility</u>

The final PSR correctly denied the defendant a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  As explained in the United States' supplemental sentencing statement, it is the defendant's burden to clearly demonstrate acceptance of responsibility for his offense.  He has not and cannot do so here.  The two-level adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt."  U.S.S.G. § 3E1.1, cmt. n.2.  Only in "rare situations" will a defendant who goes to trial be able to demonstrate acceptance of responsibility for purposes of the adjustment.  *Id.*  In determining whether a defendant qualifies for acceptance of responsibility, courts look to factors such as "truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3."  *Id.*, cmt. n.1.  In the rare situations in which a defendant proceeded to trial, a determination that the defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.  *Id.*, cmt. n.2.  Furthermore, the Ninth Circuit has held that the court should "base[] its final decision on the facts of the case and record as a whole."  *United States v. Gambino-Ruiz*, 91 F.4th 981, 991 (9th Cir. 2024) (citation omitted).

16

Here, like in *Gambino-Ruiz*, where the Ninth Circuit upheld the district court's finding that the defendant was not entitled to acceptance of responsibility, Budhabhatti could have, but elected not to, pursue less rigorous avenues of preserving any legal challenges, including a conditional plea, a bench trial, or a stipulated facts trial. Instead, Budhabhatti took his case to a jury trial where he contested essentially all the facts and evidence and put the government to its burden of proof as to every element of the offenses. To note some examples, Budhabhatti refused to stipulate that the wires charged in Counts 2–10 of the SSI were interstate in nature, despite the United States' repeated requests that he do so to avoid the expense and burdens associated with calling the seven witnesses who testified regarding that element.[7] *See* 5/20/2025 Tr. at 3. Through counsel, Budhabhatti cross-examined nearly every single government witness. Also, in closing arguments, Budhabhatti attacked the credibility of the United States' witnesses, (5/30/2025 Tr. at 143-49, 154, 160-62), challenged whether Rudo owed a fiduciary duty— the third element of the honest services offense, (*id.* at 151), and challenged the conspiracy charge, claiming the evidence showed multiple conspiracies and contesting his role in an earlier attempt to obtain a donation of land from Waikoloa Highlands through an AHA, (*id.* at 163-65). Budhabhatti was

---

[7]    To be clear, Budhabhatti had every right to put the United States to its burden of proof at trial on every element of the offenses charged. However, he is not entitled to acceptance of responsibility for his decision to do so.

17

not preserving any constitutional challenge by contesting the facts and denigrating witnesses.

Like Gambino-Ruiz, Budhabhatti also sought to keep out his proffer statements at trial—the very statements he now argues equate to his acceptance of responsibility.  Prior to trial, Budhabhatti argued extensively that the government was misconstruing his proffer statements and that he did not make the admissions the government claims he did in the written FD-302s.  *See* ECF Nos. 386 at 8-12 (Budhabhatti "does not confess to bribing [Rudo]") and 416.  And he continued that fight prior to the closure of the government's case.  *See* ECF No. 476.  Indeed, throughout the trial he argued and made representations that were inconsistent with his proffer statements.  *See* ECF No. 468.  Accordingly, some of his statements were admitted at trial, over his objection, through the testimony of Special Agent Radzicki.  Finally, like Gambino-Ruiz, Budhabhatti did not make a statement to the USPO, further demonstrating a lack of acceptance.  Many of Budhabhatti's challenges to the draft PSR reflect a lack of acceptance of responsibility as well.

Contrary to his assertions, Budhabhatti did not voluntarily terminate or withdraw from the conspiracy.  He continued to collect rental income from Honuaula after he was indicted.  And that misconduct continued until Honuaula began to withhold its rental payments.  Budhabhatti spent much, if not all, of the money he received from his bribery scheme and has yet to pay any of it back.  He

has made no post-rehabilitative efforts. Budhabhatti's actions are the antithesis of acceptance of responsibility.

Despite having been convicted by the jury, Budhabhatti continues to maintain that he is innocent of the crimes for which he was convicted and is pending sentencing. A defendant cannot receive credit for acceptance of responsibility for conspiring to commit, and committing, honest services wire fraud while maintaining that he is not guilty. The facts of the case and the record as a whole show that Budhabhatti has demonstrated no acceptance of responsibility and the PSR correctly denies any adjustment under U.S.S.G. § 3E1.1.

## THE RELEVANT SECTION 3553(a) FACTORS

The advisory Guidelines range is only one of several factors that this Court must consider when imposing a sentence consistent with 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The other factors include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter criminal conduct; and the need to avoid unwarranted disparities in sentencing. 18 U.S.C. § 3553(a). Based on these factors, the United States submits that a sentence of incarceration of 151 months is the appropriate sentence in this case.

19

**I.      The Nature and Circumstances of the Offense and the Seriousness of the Offense**

The nature and circumstances of the defendant's conduct, and the need to promote respect for the law and provide just punishment, *see* 18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A), warrant a 151-month sentence here.  The seriousness of the offense alone—a surreptitious corrupt agreement resulting in bribes and kickbacks totaling nearly $2 million to a public official conditioned on official action—warrants a Guidelines sentence.  As described in detail in the PSR, the corruption in this case was particularly outrageous.

The bribery and kickback scheme here continued for seven years, it was not a one-off event or a momentary lapse in judgement.  Rather, it was a sustained pattern of corruption involving four AHAs and numerous kickback payments totaling nearly $2 million, some of which were paid by the defendant to Rudo directly.  And the defendant enriched himself by receiving over $1 million.  The scheme was also extraordinarily lucrative, syphoning public benefits valued at over $11 million.

The defendant knew the scheme was not only wrong, but illegal.  He was not navigating some supposed fine line between bribery and self-dealing or a mere conflict of interest.  As his email communications and statements to the government show, he knew that he and his coconspirators had crossed the line into criminal behavior.  Budhabhatti knew that "Rudo's job for the Luna Loa deal was

20

to get AHCs from the county, which they planned to sell to raise the $1 million needed to acquire the DR Horton property." 05/28/2025 Tr. at 130-31. "Budhabhatti would disguise e-mails to Mr. Rudo's county e-mail address by claiming to need technical assistance from Mr. Rudo on affordable housing deals." *Id.* at 131. "Budhabhatti specifically made these and other efforts in order to hide Mr. Rudo's involvement with the Luna Loa and other affordable housing deals." *Id.* Budhabhatti "paid Alan Rudo and another person money from the sales of affordable housing credits he had obtained through affordable housing agreements using Rudo's official position within Hawaii county." *Id.* That is why the defendant and his coconspirators went to such extraordinary lengths to hide the kickbacks through shell companies and trusts. The jury's verdict reflects what is obvious; you cannot pay a public official to obtain a government contract. Doing so is bribery, plain and simple.

One of the foundational principles of the American political system is that the government derives its legitimacy from the consent of the governed. Inherent in this social contract is the public's trust that government officials, as stewards of public power, will conduct business not for their own benefit, but for the public good. Accordingly, when the honesty and integrity of public officials is corrupted through a bribery and kickback scheme such as this one, it shatters the very bedrock of our system. As the Eleventh Circuit recently explained:

21

> Bribery cannot properly be seen as a victimless crime, for
> in a sense it threatens the foundation of democratic
> government.  Putting aside the financial havoc it can
> cause, bribery tears at the general belief of the citizenry
> that government officials will carry out their duties
> honestly, if not always competently.  And that harm,
> though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014).  Similarly, other

courts have emphasized this general concern.  *See*, *e.g.*, *United States v. Sorenson*,

233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("[T]he community—historically and

presently—requires that real, tangible, and severe consequences meet those who

gain a position of public trust and then abuse that trust for personal gain.  Unless

that traditional principle is honored, political corruption will slowly corrode the

foundations of our democracy until it collapses under its own weight."); *United*

*States v. Conyers*, 737 F. Supp. 2d 696, 702 (E.D. Mich. 2010) (recognizing that

"'[b]ribery is a betrayal of trust'" and the "'social injury inflicted by breaches of

trust goes beyond any material measurement'") (quoting Judge John T. Noonan,

*Bribes* (citation omitted)).

What makes this offense so insidious, however, is its victimization of

struggling Hawaiians.  For years, the lack of affordable housing has been a chronic

problem for the Isle of Hawaii and, indeed, the Nation.  Hawaii County enacted its

affordable housing policy to address this dire situation.  In 2019, even as the

defendants continued to execute their scheme, the Big Island was suffering from a

shortage of 10,000 affordable housing units.  Rather than build and sell or rent

affordable housing to meet that need, which the County believed and trusted they

would do, the defendant and his coconspirators obtained AHAs that awarded them

valuable AHCs immediately and sold them instead.  Each credit the defendant sold

to pad his wallet was another unit of affordable housing that was not built to house

Hawaii residents.  The defendant quite literally robbed from the poor to benefit

himself.  Simply put, the defendant's crimes are serious, and they demand a

correspondingly serious response.  The alternative – to treat this conduct lightly –

would validate the public's concern that this sort of white-collar crime is not

viewed by our courts as serious or corrosive.  As the Tenth Circuit observed in

*United States v. Morgan*, 635 F. App'x 423 (10th Cir. 2015):

> [O]ne of the primary objectives of sentencing [public]
> officials convicted of bribery is to send a message to
> other public officials that bribery is a serious crime that
> carries with it a correspondingly serious punishment.

*Id.* at 450-51 (citation modified).  This Court too must stand firmly against such

secret, sophisticated, and unabashed corruption as that exhibited by the defendant

here.

## II.    **The Defendant's History and Characteristics**

The defendant's history and characteristics also justify a Guideline sentence.

He was raised in a supportive and loving household.  PSR ¶ 97.  He received an

advanced education, became a United States citizen, and lived and worked in

23

California and Hawaii for much of his adult life where he was freely able to pursue his passions.  PSR ¶¶ 101, 103.  Moreover, he has a supportive family.  PSR ¶¶ 96. He has benefited from many privileges in life that most defendants who come before this Court for sentencing have lacked.  Despite those advantages, he resorted to corruption motivated by unbridled greed.  In May 2016, Zamber notified Budhabhatti that Budhabhatti would be getting $384,000 by June 6, as a result of the AHC sales to Moaniala Holdings.  Trial Ex. 86.  Budhabhatti responded, "I guess it will be here for my birthday present. :)."  *Id.*  On January 2, 2019, Budhabhatti wrote to Zamber regarding how he intended to spend the money from West View's sale of AHCs to Hawaii One 1:

> Aloha Bro Gary,
> FYI, I am buying a Hawaii-like home here in Bay area!
> I have found 10 acres of parcel in redwoods with a creek
> flowing through. Perfect setting for an ashram.
> I am putting the place in excrow [sic], down payment will come
> from the sale of credits escrow.
> Let me know if Enrie [sic] deposited the 50K yet.
> You will have a home here when you come visit.
> BTW, let's catch up and have a talk, more about personal
> matters.
> Best regards
> Raj

Trial Ex. 188; *See also* PSR ¶ 37.  Less than three months later, Zamber sent a letter to the OHCD on behalf of West View falsely stating that the funds from the sale of AHCs to Hawaii One 1 would be used to fund an affordable housing development.  PSR ¶ 37.  Simply put, Budhabhatti not only concealed his corrupt

24

agreement with Rudo but he failed to construct the affordable housing he promised and lied to the OHCD about how he was using the funds from AHC sales. Budhabhatti's continued assertion that he was merely assisting Rudo's "self-dealing," moreover, demonstrates his complete lack of remorse. This factor, too, counsels in favor of a Guidelines sentence. *See United States v. Hilgers*, 560 F.3d 944, 948 (9th Cir. 2009) (among other factors, lack of remorse justified fraud defendant's above-Guidelines sentence).

If the defendant argues that his minimal criminal history, his employment history, or the collateral consequences associated with this conviction support a substantial downward variance, such claims would be meritless. [8] The Guidelines generally prohibit consideration of socioeconomic status, successful employment history, and reputational collateral consequences in fashioning a sentence. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); *see also* U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant); U.S.S.G. § 5H1.10 (socioeconomic status not relevant). Indeed, courts have "repeatedly expressed a

---

[8] Moreover, the Guidelines already account for the defendant's minimal prior criminal history by placing him in the lowest Criminal History Category of the Sentencing Table.

distaste for sentencing that reflects different standards of justice being applied to white and blue collar criminals," based on the need to deter large-scale fraud and the possibility that a lenient sentence may "undermine[] public confidence in whether the justice system is doing equal right to the poor and the rich as our oath requires." *United States v. Hoffman*, 901 F.3d 523, 556-57 (5th Cir. 2018) (citation modified); *see also, e.g., Morgan*, 635 F. App'x at 444 (reversing sentence, in part, based on procedural error in relying on such collateral consequences because those rationales "impermissibly favor criminals . . . with privileged backgrounds"); *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013) (explaining that a lesser sentence based on "humiliation before his community, neighbors, and friends . . . would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along those lines" and rejecting such reasoning (citation omitted)); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

26

### III.   The Need for Deterrence

Deterrence, both specific and general, also justifies a 151-month sentence here. *See* 18 U.S.C. § 3553(a)(2)(B).  The defendant continued to engage in criminal activity even after he was indicted by continuing to collect and spend rental income from Honuaula as the Manager of West View.  This misconduct persisted until Honuaula began to withhold its rental payments.  There is no reason to believe that the defendant would have ceased executing the scheme absent law enforcement's intervention and Honuaula's unilateral refusal to continue paying rent while being hamstrung from constructing affordable housing on account of the defendants' fraud.  It also appears that the ordeal of the trial has done little to persuade the defendant to acknowledge his misconduct and make amends.  Given his lack of contrition, there is no reason to believe he would not engage in similar conduct again if offered the opportunity.  Specific deterrence, unlike in the average public corruption case, is at issue here.

General deterrence is perhaps a more pertinent concern under § 3553(a)(2)(B).  The sentence imposed must send a message of general deterrence that corruption of public servants will not be tolerated.  Courts have recognized that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes." *Morgan*, 635 F. App'x at 450; *see also, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (describing "economic and

27

fraud-based crimes a[s] more rational, cool, and calculated than sudden crimes of passion or opportunity" and, therefore, "prime candidates for general deterrence" (citation modified)).  Specifically, the sentence should make clear that those who would bribe a public official will face serious consequences.  *See United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006) (explaining that it is necessary "to impose strict penalties on all defendants who engage in [public corruption]").  The need for general deterrence is particularly important in cases such as this one, which erode public confidence in our institutions and are notoriously difficult for law enforcement to detect.  *See id.* (recognizing that public corruption crimes "undermine[] the essential confidence in our democracy and must be deterred if our country . . . is ever to achieve the point where the rule of law applies to all— not only to the average citizen, but to all elected and appointed officials").

The defendant gamed the system and converted public benefits into private gain by feeding the greed of a corrupt public official.  His misconduct contributed to an erosion of faith in the OHCD and in public institutions generally.  Accordingly, the sentence here must do more than just deter the defendant.  The Court must fashion a sentence that will rehabilitate the citizens' of Hawaii and their faith in County government and instill public confidence that the criminal justice system is prepared to protect them.  The Court's sentence should also be aimed at uprooting a culture of corruption that has begun to take hold in Hawaii, as

28

evidenced by this case and a spate of other recent public corruption prosecutions in this District. Other would-be bribe payers in Hawaii should be given no comfort by the sentence the Court imposes in this case. A sentence of 151 months incarceration is necessary to accomplish these goals.

## IV.    The Need to Avoid Unwarranted Sentence Disparities

A significant sentence in this case is warranted and would not be out of line with other sentences imposed in bribery cases involving similar conduct. One factor a sentencing court is required to consider is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Throughout the country, courts have imposed sentences of approximately ten years or more in bribery cases involving similar or even less egregious conduct, reflecting the judiciary's collective acknowledgement of the seriousness of corruption offenses. *See, e.g., United States v. Menendez*, No. 23-CR-00490-SHS (S.D.N.Y. Jan. 29, 2025) (former U.S. Senator sentenced to 11 years for receiving hundreds of thousands of dollars in bribes from businessmen, who were sentenced to 97 months and seven years);[9] *United States v. Montgomery*, 275 Fed. App'x. 647 (9th Cir. 2008) (defendant sentenced to 240 months in prison for bribery and

---

[9]    https://www.justice.gov/usao-sdny/pr/former-us-senator-robert-menendez-sentenced-11-years-prison-bribery-foreign-agent-and

money laundering conspiracy involving between $2,500,000 and $7,000,000);

*United States v. Hamilton*, 3:11-cr-00013-HEH (E.D. Va. Aug. 12, 2011) (Virginia

delegate sentenced to 114 months after receiving bribe worth approximately

$80,000);[10] *United States v. Maggio*, No. 15-CR-00001-BSM (E.D. Ark. Mar. 24,

2016) (Arkansas judge sentenced to 120 months after receiving $24,000 bribe in

exchange for reducing a civil jury verdict);[11] *United States v. Woods*, No. 17-CR-

50010-TLB (W.D. Ark. Sept. 6, 2018) (Arkansas state senator sentenced to 220

months and $1,621,500 in restitution after receiving bribes);[12] *United States v.*

*Arturo Cuellar, et al.*, No. 19-CR-00522 (S.D. Tex. Jan. 18, 2023) (two middlemen

sentenced to 20 years and 16.5 years for funneling bribes to county commissioners

in $4.1 million bribe scheme).[13]

Closer to home, judges here in Hawaii likewise have issued serious

sentences in similar bribery cases, reflecting the damage caused to the people of

Hawaii by the scourge of corruption. *See United States v. Stant*, No. 22-CR-

---

[10]    https://www.justice.gov/archives/opa/pr/former-member-virginia-house-delegates-sentenced-114-months-prison-bribery-and-extortion

[11]    https://www.justice.gov/archives/opa/pr/former-judge-sentenced-10-years-accepting-bribe-during-his-arkansas-court-appeals-campaign

[12]    https://www.justice.gov/usao-wdar/pr/former-arkansas-state-senator-sentenced-220-months-federal-prison-wire-fraud-mail-fraud

[13]    https://www.justice.gov/archives/opa/pr/three-men-sentenced-roles-bribery-conspiracy

00072-DKW (D. Haw. Feb. 8, 2023) (Maui County employee sentenced to ten years after accepting bribes worth approximately $2,000,000);[14] and *United States v. Inouye, et al.*, No. 21-CR-00034-LEK (D. Haw. May 24, 2023) (Honolulu building inspector sentenced to 60 months after accepting over $100,000 in bribes).[15]

A significant variance from the Guidelines would create unwarranted sentencing disparities.  Indeed, the value of the bribes and things received by Budhabhatti, over a million dollars, and his co-defendants exceeds (in some cases, significantly) the value of the bribes and things received in the above-referenced cases.  Moreover, as discussed above, the offense conduct and culpability among Budhabhatti and his codefendants puts them all essentially in the same boat, albeit with a few personal circumstances, such as Sulla's age and Budhabhatti's criminal history, factoring in.  But as to the offense conduct, their circumstances do not warrant significant disparities among the sentences in this case, or as compared to other cases.  Each one of the defendants played a critical role in the bribery scheme.  Budhabhatti was involved throughout the entire scheme—a period of

---

[14]    https://www.justice.gov/usao-hi/pr/former-maui-county-official-sentenced-ten-years-federal-prison-honest-services-wire

[15]    https://www.justice.gov/usao-hi/pr/department-planning-and-permitting-examiner-sentenced-ten-months-prison-bribery-scheme

seven years.  His percentage of the proceeds from the fraud, over $1 million, was significant.  Just as with Rudo, Zamber, and Sulla, this scheme would not have worked without Budhabhatti playing his role.

To be sure, no two cases are the same, and the Court must make a particular assessment of each defendant in each case.  However, the government's recommendation for a significant term of imprisonment is in line with the sentences imposed by other courts in cases involving similar conduct.  Although the USPO recommends a considerable variance from a low-end sentence of 151 months down to 97 months (essentially, a reduction of 4.5 years or roughly 35 percent), the government respectfully disagrees with the justification set forth for that generous break.  For example, growing up in a stable and supportive family does not provide an excuse to commit crimes, and a longstanding intellectual capacity and occupational stability, as well as marijuana use, are aggravating factors, not mitigating.

Conversely, Budhabhatti was an educated engineer working in Hawaii while conspiring to corrupt a Hawaii County public official.  Moreover, he enjoyed a comfortable upbringing, extensive education, and a nice life in Hawaii.  Indeed, according to the PSR, Budhabhatti maintained for years and continues to earn a six-figure salary, as well as receives rental income from a property he owns in Hawaii.  During the period he was not earning a six-figure salary, he was living off

32

the proceeds of his fraud.  He did not need to do this; it was a cash grab from the

County.  Furthermore, as noted in the PSR, Budhabhatti's criminal history "reflects

a concerning pattern of domestic violence-related conduct that weighs heavily in

aggravation" and shows a disregard for the court system and authority.  PSR at

PageID.11690.  His crimes were driven by greed, access, and opportunity, not the

kind of desperate circumstances often seen in the backgrounds of less fortunate

criminal defendants.

Zamber was sentenced to 70 months imprisonment.  His Guideline range,

however, was lower than both Budhabhatti's and Sulla's.  And the amount Zamber

profited from the scheme was much less than Sulla and Budhabhatti.

Budhabhatti's sentence should be significant.  The government's recommended

sentence of 151 months imprisonment is in line with the sentences imposed by

other courts in bribery cases involving some similar conduct and is sufficient but

not greater than necessary to achieve the goals of sentencing.

//

//

//

//

//

//

33

## CONCLUSION

Based upon the considerations set forth above, the United States recommends a sentence of 151 months of imprisonment, which is appropriate and reasonable given the factors set forth in 18 U.S.C. § 3553(a). The United States also requests that the Court impose a three-year term of supervised release and order the defendant to pay a forfeiture money judgment in the amount of $549,775.

DATED: February 1, 2026, at Honolulu, Hawaii.

Respectfully submitted,

KENNETH M. SORENSON
United States Attorney
District of Hawaii

By */s/ Margaret C. Nammar*
   MOHAMMAD KHATIB
   MARGARET C. NAMMAR
   Assistant U.S. Attorneys

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section

By */s/ William Gullotta*
   WILLIAM GULLOTTA
   Trial Attorney
   Public Integrity Section
   U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the following

individuals on the date and in the manner described below:

Served Via CM/ECF:

SALINA KANAI, FPD          salina_kanai@fd.org
MELINDA YAMAGA, AFPD       melinda_yamaga@fd.org
Attorneys for Defendant
RAJESH P. BUDHABHATTI

DATED: February 1, 2026, at Honolulu, Hawaii.

*/s/ Margaret C. Nammar*
Assistant U.S. Attorney